ALBRITTON ET AL., APPELLANTS, *v.* NEIGHBORHOOD CENTERS
ASSOCIATION FOR CHILD DEVELOPMENT, APPELLEE.

[Cite as Albritton *v.* Neighborhood Centers Assn. (1984),
12 Ohio St. 3d 210.]

(No. 83-1052—Decided August 1, 1984.)

*Mr. Alan I. Goodman,* for appellants.
*Mr. Neil E. Roberts,* for appellee.

WILLIAM B. BROWN, J. The issue presented by this case is whether an organization enjoys immunity from liability for damages in tort merely because it is organized for charitable purposes. Because this court can no longer discover any valid, rational reasons for retaining charitable immunity this doctrine is hereby abolished.

A preliminary question is raised as to whether NCA is, in fact, a charity and able to raise the defense of charitable immunity at all. Albritton contends

that NCA is a far different organization than the purely eleemosynary institution envisioned at the time charitable immunity was established. Instead, Albritton maintains NCA is a quasi-governmental organization and subject to liability under this court's ruling in *Enghauser Mfg. Co.* v. *Eriksson Engineering Ltd.* (1983), 6 Ohio St. 3d 31. In support of this position, Albritton points to the source of NCA's funds and the agreement to abide by the rules and regulations of various governmental levels.

Civ. R. 56(E) provides, in pertinent part:

"* * * When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

Thus, a party must establish, by specific facts, that there is a genuine issue for trial in order to avoid summary judgment. *State, ex rel. Garfield Heights,* v. *Nadratowski* (1976), 46 Ohio St. 2d 441, 442-443 [75 O.O.2d 497]. Unsupported allegations in opposition to a motion for summary judgment are insufficient to require denial of the motion. *Harless* v. *Willis Day Warehousing Co.* (1978), 54 Ohio St. 2d 64, 66 [8 O.O.3d 73]; *Mathis* v. *Cleveland Public Library* (1984), 9 Ohio St. 3d 199, 202.

In the present case, Albritton has never presented any specific facts, beyond the allegations in her pleadings, to challenge NCA's status. In contrast, NCA has supplied proof that it is a private nonprofit entity, created by incorporation and established as a tax-exempt charitable institution. Absent some factual response, by affidavit or as otherwise provided by Civ. R. 56, there was no issue to determine and the conclusion that NCA is a charity was proper. Albritton failed to make such a response. The only possible factual conclusion is, therefore, that NCA is a charity.

The legal conclusion is the same. Receipt of governmental funds alone is insufficient to transform an entity from charity to quasi-governmental agency. NCA had a contract to provide services. Public monies were paid NCA under that contract. Compliance with applicable laws and regulations by NCA was one condition of the contract. Under Albritton's rationale, any person or entity from church soup kitchen to defense supplier or highway contractor, under contract with any level of government by which public monies are paid and governmentally established standards met, would become a quasi-governmental agency. Obviously this contention reaches too far.

Instead, the relevant concern is whether an organization's day-to-day operations are governmentally supervised, not whether it receives public money and complies with governmental standards and regulations. *United States* v. *Orleans* (1976), 425 U.S. 807, 815. Albritton has produced no evidence whatsoever of day-to-day governmental supervision of NCA's operations.

The critical question is whether the doctrine of charitable immunity re-

tains any validity in Ohio today. The origin of the doctrine in the United States is well documented and needs no repetition here. See *Avellone v. St. John's Hospital* (1956), 165 Ohio St. 467, 469 [60 O.O. 121], citing *President & Directors of Georgetown College v. Hughes* (C.A.D.C. 1942), 130 F. 2d 810. Suffice it to say that the rule was originally erroneously adopted in that it derived from *dicta* in two English cases which had already been overruled. Despite such a tenuous inception, the doctrine of charitable immunity spread until it became a concept firmly embedded in American jurisprudence, although not one universally accepted.

However, the "rule" of charitable immunity is, in reality, not a rule at all. In the first place, charitable immunity is an exception to the general principle of liability for tortious conduct. Individuals and entities are ordinarily held responsible for their own legally careless action and for negligent harms inflicted by their agents and employees. The form of legal organization may affect where liability is ultimately placed. But, in general, it does not nullify liability altogether and does not leave the burden of negligent injury to be borne exclusively by the victim.

Moreover, the "rule" of charitable immunity has itself been devoured by exceptions. The immunity was first adopted in Ohio in *Taylor v. Protestant Hospital Assn.* (1911), 85 Ohio St. 90. Subsequent decisions gave additional vitality to that doctrine. Since then, the landscape of charitable immunity has been so pockmarked with exceptions as to be virtually unrecognizable. Immunity for hospitals has been abolished. *Avellone v. St. John's Hospital, supra.* There is no charitable immunity where the injured plaintiff is not a beneficiary of the defendant charity or where the plaintiff is harmed as a result of the charity's negligence in the selection or retention of an employee. *Gibbon v. Y.W.C.A.* (1960), 170 Ohio St. 280 [10 O.O.2d 334], paragraph one of the syllabus. Likewise, a charity is liable where it operates a business enterprise for profit not directly related to the purpose for which the organization was established. *Blankenship v. Alter* (1960), 171 Ohio St. 65 [12 O.O.2d 83]. Finally, there is no immunity where the plaintiff pays for services rendered by the charity. *Bell v. Salvation Army* (1961), 172 Ohio St. 326 [16 O.O.2d 110]. In light of these exceptions it is apparent that the doctrine of charitable immunity is not an ironclad, sacrosanct rule but has been severely limited in its actual application. Indeed, the very existence of these manifold exceptions militates strongly against all of the policy arguments advanced in favor of retention of the doctrine.

Furthermore, charitable immunity does not, and has not, existed as a "rule" in the nation as a whole. In other jurisdictions charitable immunity survived only in a welter of conflict founded on a kaleidoscope of result and reasoning. See, generally, *President & Directors of Georgetown College v. Hughes, supra,* at 817-822. There is, consequently, no compelling precedential reason for retention of this doctrine.

This court has previously founded its acceptance of charitable immunity on the theory of public policy. *Avellone* v. *St. John's Hospital, supra,* at 473; *Gibbon* v. *Y.W.C.A., supra,* at 288. This theory reasons that charities are good and that their purpose, to provide services for intended beneficiaries, should not be defeated by indemnification of tort claimants. As NCA has characterized the rationale, it has been determined that the benefit to society as a whole from protecting charitable organizations outweighs the detriment to any one particular injured individual.

As was discussed in *Avellone,* resolution of such a question involves a balancing of two rights. On the one hand is the right of charitable organizations to any benefit and assistance which society can justly allow them. On the other hand is the right of an individual, injured by the negligence of another, to seek compensation. In *Gibbon* this court concluded that public policy considerations were not such as to alter the doctrine of charitable immunity beyond its state at that time. A careful review of the competing policies underlying the present question convinces this court that that conclusion is no longer justified.

In the first place, it is certainly true that a personal injury is no less painful, disabling, costly, or damage producing simply because it was inflicted by a charitable institution rather than by any other party or entity. Indeed, it is almost contradictory to hold that an institution organized to dispense charity shall be charitable and give aid to others but shall not compensate or aid those individuals who have been injured by it. *Geiger* v. *Simpson Methodist-Episcopal Church of Minneapolis* (1928), 174 Minn. 389, 219 N.W. 463; *Fitzer* v. *Greater Greenville So. Car. Y.M.C.A.* (1981), 277 S.C. 1, 282 S.E. 2d 230.

As has previously been noted by this court, when an individual is injured or killed through the negligence of a charitable institution there is a strong likelihood that the individual or his or her family will become dependent upon outside support unless recovery may be had. *Avellone, supra,* at 476. Such support may be met by governmental assistance or may have to be assumed by another charity.

In addition, a policy exempting a charitable organization from having to compensate for harm caused by it is equivalent to requiring an injured individual to make an unwilling contribution to that organization in the amount of the compensation which would be due him had he been injured by a non-charitable entity. *Malloy* v. *Fong* (1951), 37 Cal. 2d 356, 232 P. 2d 241. Such coerced donations are inimical to the whole concept of charitable donation and service. They are, to say the least, distinctly uncharitable.

At its heart, the whole policy behind charitable immunity rests upon the idea that we do not want to discourage charitable activities or force charities out of business by subjecting them to tort liability. However, as was aptly stated in *Flagiello* v. *Pennsylvania Hospital* (1965), 417 Pa. 486, 503, 208 A. 2d 193, 201:

"If havoc and financial chaos were inevitably to follow the abrogation of the immunity doctrine, as the advocates for its retention insist, this would certainly have become apparent in the states where that doctrine is no longer a defense."

As Dean Prosser has indicated, this argument appears to have been concocted in some defense counsel's imagination rather than having been based on experience. Prosser, Law of Torts (4 Ed. 1971) 994, Section 133. Nowhere is there the slightest evidence that the role of charities has been repressed in the overwhelming majority of jurisdictions which have abolished the rule as opposed to the handful which retain some form of immunity. This reality is independent of the existence of liability insurance. In short,' charities continue to operate with very little regard as to whether they are immune from tort liability or not.

In 1956, in *Avellone,* this court observed that the law on charitable immunity was unsettled. In 1984, that is no longer the case. Since Judge Rutledge's opinion in *President & Directors of Georgetown College* v. *Hughes, supra,* the course of the law has changed dramatically. His demolition of the arguments in favor of charitable immunity has been followed by a deluge of decisions in the same vein. See Annotation (1983), 25 A.L.R. 4th 517 *et seq.* and the cases cited therein. Jurisdictions which have totally abolished charitable immunity now number well over thirty. Apparently, no state continues to grant absolute immunity to charities. Opinion among legal scholars is virtually unanimous that charitable immunity no longer has any valid reason for existence and must go. See 15 American Jurisprudence 2d (1976) 232, Charities, Section 190. The Restatement of the Law, Torts 2d (1979) 420, Section 895E would have the law be that "[o]ne engaged in a charitable, educational, religious or benevolent enterprise or activity is not for that reason immune from tort liability." Prosser saw the immunity in full retreat and predicted, with his approval, its rapid disappearance from American law. Thus, to continue to hold in favor of charitable immunity is out of step not just with the trend but with the reality of the law in this country.

Lastly, NCA contends that if charitable immunity is to be abolished it should be done by the General Assembly and not by the courts. This argument has repeatedly been demolished in other contexts. There is no doubt that charitable immunity was judicially created in Ohio. As was expressed in *Enghauser Mfg. Co.* v. *Eriksson Engineering Ltd., supra,* at 33, this court not only has the power but the duty and responsibility to evaluate an immunity doctrine in light of reason, logic and the actions and functions of the relevant entities in the twentieth century. It is, therefore, the proper province of this court to correct judicially created doctrines if they are no longer grounded in good morals and sound law. *Harris* v. *Y.W.C.A.* (1968), 250 Ind. 491, 237 N.E. 2d 242.

For these reasons, this court now concludes that the doctrine of charitable immunity is hereby abolished. A charitable organization is subject to liability in tort to the same extent as individuals and corporations. The

judgment of the court of appeals is reversed and the cause remanded to the trial court for further proceedings.

*Judgment reversed and*
*cause remanded.*

CELEBREZZE, C.J., SWEENEY, C. BROWN and J. P. CELEBREZZE, JJ., concur.

LOCHER and HOLMES, JJ., dissent.

LOCHER, J., dissenting. The issue set forth by the majority in today's decision is not in accord with the reality of charitable immunity in Ohio. Accordingly, I feel compelled to dissent to what I feel is an overbroad position adopted by my brethren.

Ohio does not recognize complete charitable immunity. Instead, over the years this court has wisely adopted a case by case formula for retaining or abrogating charitable immunity based upon the policy dictates of the individual factual circumstances. Thus, as the majority correctly points out, charitable immunity has been previously abolished where the defendant charity is a hospital, where the injured plaintiff is not a beneficiary of the charity, where the plaintiff is harmed as a result of the charity's negligence in the selection or retention of an employee, where the plaintiff pays for services rendered by the charity, and where the charity operates a business enterprise for products not directly related to the purpose for which the organization was established. Immunity has been previously retained, however, for those many charities ministering to the needy, including those other smaller charities balanced precariously on the edge of financial abyss. As government support has continued to diminish, the ranks of the needy have swelled in response. Until today's opinion this court had recognized, as a matter of public policy, that not all charitable organizations could shoulder their burdens and still pay insurance premiums and legal fees in the face of potential negligence liability.

The many exceptions presented by the majority, contrary to their "exception devouring the rule" characterization, are the result of many decades of thoughtful, patient policy analysis by this court. Exceptions have not gobbled the rule; instead, the rule has adapted to the times and to the needs of charities. Now, in a single stroke, the majority has chosen to abolish all charitable immunity based on a narrow factual pattern concerning a governmentally funded charitable organization. This position is squarely against this court's previous posture of judicial restraint.

A similar abrogation of judicial restraint was effected in *Haverlack v. Portage Homes, Inc.* (1982), 2 Ohio St. 3d 26. In *Haverlack,* and in a series of subsequent cases, *dicta* was bootstrapped into the law of this state in the abolition of sovereign immunity. As a practical matter the entire issue of sovereign immunity was resolved prior to the time individual parties could

present their justifications for retaining the policy. In the case *sub judice* a variation on the *Haverlack* theme has been promulgated. A narrow factual circumstance, in this case a governmentally subsidized program run by a charity, is used as a basis for a sweeping syllabus that eliminates all charitable immunity. This result need not and should not be mandated by these facts.

A better approach has been utilized in the area of intrafamilial and interspousal immunities where each case is scrutinized on its facts and resolved on policy adequately articulated by the parties. See, *e.g., Mauk* v. *Mauk* (1984), 12 Ohio St. 3d 156; *Bonkowsky* v. *Bonkowsky* (1982), 69 Ohio St. 2d 152 [23 O.O.3d 188]. Until now, this was the same approach successfully applied in the area of charitable immunity. By rejecting this approach the majority indulges in legislation. Unlike legislative procedure, however, the parties before us could not present their complete arguments justifying an all-encompassing rule. We cannot issue broad pronunciamentos since we are institutionally limited by the facts before us. Today's decision impacts on a wide range of charities not financed by governmental entities and therefore not represented by the parties in interest. Moreover, with less and less governmental support of charities, the facts upon which the majority predicates its new position are more likely to be the exception rather than the rule.

To the degree that volunteerism is suffocated and discouraged by the stunting of the spirit and balm of love, compassion and understanding promulgated through charitable works, today's result can only create an expensive bureaucratic tangle. Volunteerism will be chilled and assistance to the hungry and dispossessed will diminish, in exact degree, to sweeten the coffers of the John Street insurance empires. In this tangle the small but sturdy charity which gives aid to the small towns and communities in this state is engulfed and slowly strangled while the few large, structured, and financially viable charities of the larger cities will survive. The committed and dedicated men and women from all walks of life who give service to charity gain in fraternity and spirit by coming to the aid of those in need. Thus not only will the indigent and downtrodden pay the price for today's decision, but the ethical and moral fiber of what gives worth to the lives of so many citizens, and makes this country great, will be diminished.

The majority offers a number of reasons for abolishing charitable immunity. None justifies the ultimate result.

The first reason presented is the hypothesis that the exceptions to the rule have "devoured" it. As articulated previously this argument is the opposite of judicial restraint and the institutional mandate that courts should make decisions based on the facts before them.

The second argument presented by the majority presupposes that charitable immunity should be abolished because that is "the trend." This type of argument, while superficially plausible, neglects our ruling as an individual court and suggests we should rule based on national consensus and

the mathematics of the majority. Today's trend, however, may become tomorrow's tyranny. History and common sense dictate that a trend may be a good tool in evaluating a policy, but should not take on a life of its own as a justification bereft of a context. What is good for one state may not be good for another.

The third reason offered by the majority examines the underlying policy behind charitable immunity. No one would argue that personal injury is diminished because it is inflicted by a charitable institution. This court, however, has never promulgated such a rule nor do we support it here.

The majority justifies its decision by a balancing test — the right of the injured individual against the right of the charitable organization. Yet, our prior cases, now overruled *en masse,* have taken that identical approach in allowing a modified charitable immunity to exist. Under this court's prior approach we might very well reach the decision adopted today to the extent the evidence demonstrates a governmentally funded charity can support the pecuniary burdens of potential negligence liability. No such evidence was presented by the parties in interest, however, and the majority is not content with limiting the effect of this decision to the proper parties. Thus an injured foot has become the means to stamp out all immunity for charities. No distinction is made, nor was even presented, to distinguish between large governmentally funded charities and those many small charities barely able to purchase the potatoes for soup kitchens, let alone the premiums for insurance protection.

The sociological studies which might provide an empirical basis for today's sweeping opinion were never presented, never briefed, and never considered because the charity in question was never perceived to be *all* charities. Although the majority relies heavily on the chill, academic conjecture of learned commentators, no mention is made of empirical studies which dispassionately review actual statistics from jurisdictions where immunity has been abolished. Such studies tell a story different than the speculation relied upon by the majority and suggest that when abolition of immunity occurs it is the public which must pay a substantial cost. See, *e.g.,* Canon & Jaros, The Impact of Changes in Judicial Doctrine: The Abrogation of Charitable Immunity (1979), 13 Law and Soc. Rev. 969. It is submitted that the majority forgets that the policy it so desperately seeks to destroy was established in the same sweeping manner. If we grant, as the majority seems to conclude, that it is a bad way to make law, then it is no better to eliminate law in as sweeping a manner. Law made in a moment and overturned in another moment can just as easily be reestablished in the future by justices equally impatient to impose their own sociological agenda on our state.

I must dissent today not against my fellow justices nor their lofty intentions to aid people injured by charities, but rather against their belief that "bad" law should be broadly and sweepingly eliminated at the expense of charities which never knew such a broad case was before us and never had the opportunity to rebut the presumptions of the majority. A victory under

these circumstances can only be Pyrrhic at the cost of the judicial restraint which is the basis for this court's legitimacy.

Therefore, I dissent.

HOLMES, J., dissenting. I dissent from the majority opinion based in part upon most of the points set forth in Justice Locher's dissent with which I concur. I wish to emphasize, however, the unreality of subjecting all charities, regardless of size and regardless of services performed, to tort liability to the same extent as individuals and corporations. The majority states that it is the duty of this court to evaluate an immunity doctrine in light of reason, logic and the actions and functions of the relevant entities in the twentieth century. I agree with this basic hypothesis and, in proceeding on such basis to evaluate the immunity doctrine, one may reasonably conclude that there is greater reason than ever before for the continuation of the doctrine as we have applied it in Ohio.

First, there is an ever growing need for the services, aid and counseling of the many charitable organizations and agencies serving our communities. As the need expands, the cost of providing such services accordingly escalates. The cost of liability insurance covering all facets of the agencies' operation, added to their growing budgetary problems, would prove insurmountable to many public charitable organizations.

There is a great disparity within charitable organizations, some large, serving on a state or national scale; some small, serving a given neighborhood. Some are admittedly of sizable wealth, most are of modest means, receiving all of their revenue from sources such as United Way and other volunteer fundraising efforts. There is sound reason not to apply tort liability in the same manner and degree to all charitable organizations regardless of the nature of the operation.

There is also sound reason to consider, and fairly conclude, to what extent charitable organizations may be held financially responsible for their torts. Should a monetary judgment against the charity be permitted to completely absorb and annihilate the trust property of the charity? Or should the trust res be held exempt from judgment for the benefit of the public at large?

In the determination of the application and reach of the abrogation of this long standing doctrine of immunity granted to charitable organizations in Ohio, there needs to be an input of empirical data, and public policy judgments made thereupon. Such determinations should be made by the legislative body of this state, as such body in a similar manner is currently reviewing the public policy issues of governmental immunity as recently abrogated by this court.

LOCHER, J., concurs in the foregoing dissenting opinion.