PETER MENDALL, PRO AMI

AND

GEORGE V. MENDALL

*vs.*

PLEASANT MOUNTAIN SKI DEVELOPMENT, INC.

AND

STATE PRINCIPALS' ASSOCIATION

Kennebec.　Opinion, June 14, 1963.

*Frank E. Southard, Jr.,* for Plaintiffs.

*Verrill, Dana, Walker, Philbrick and Whitehouse,*
  *by John A. Mitchell and Roger Putnam,*
*Stanwood Holt,*
*William B. Mahoney,* for Defendants.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN,
  SIDDALL, MARDEN, JJ.

WEBBER, J.   The complainants seek to recover damages for injury alleged to have been caused by the negligence of the defendants.   The defendant, State Principals' Association, filed its motion to dismiss under M. R. C. P. Rule 12 (b) (6) setting forth that the complaint fails to state a claim upon which the relief demanded can be granted.   The parties then submitted an agreed statement of facts bearing upon the basic contention of this defendant that it enjoys the immunity from tort liability accorded to charitable institutions.   The justice below quite properly treated the motion as one for summary judgment to be disposed of as provided in Rule 56.   Judgment was entered for the defendant.   The plaintiffs seasonably appealed and the issue

here presented is whether or not the defendant State Principals' Association is a charitable institution immune from liability.

The learned justice below carefully reviewed the purposes for which the Association is organized and its method of operation. He concluded that its efforts are devoted to, and all of its funds are expended in, furthering and developing education in the public secondary schools of Maine. We are concerned primarily, however, with the sources of the income of the Association. The agreed statement contains the following:

> "The Association carries on basketball tournaments, and a hockey tournament at which an admission fee is charged. The fees are collected by the committee in charge and after the expenses are paid, in basketball, one half of the net profit is given to the association, and one-half to the schools participating.

> "The One-Act Play Contests also charge admission, but the association receives none of these funds. * * *

> "State Principals' Association receives no funds from the State of Maine, municipalities, school boards or school districts. *It has no donations or funds from outside sources,* except that for the school year 1959-1960 and again for the school year 1960-1961, the State Principals' Association received $1,000.00 from the Sears Foundation to conduct a Leadership conference for secondary school student leaders." (Emphasis supplied.)

Sections 1 and 2 of Article III of the constitution of the Association provide:

> "Section 1   The annual membership dues shall be one dollar ($1.00). Membership dues are payable on or before October 1st of each year.

"Section 2  Membership shall be limited to principals of secondary schools and to members of the secondary division of the State Department of Education.
* * * "

The justice below considered the sources of income of the Association and in that connection stated:

"The plaintiffs claim that the Association is no different than any other commercial professional basketball or football outfit; that its major revenue is derived from profit rather than private or public charity. The payment of admission fees by patrons of basketball or football games sponsored by the Association presents a situation no different than if the fans got the funds together by school drives instead of by admission fees. They know that the funds are for the best interests of the secondary schools of Maine and not for private purpose; in their minds, their ticket purchases are contributions to a school cause."

It is apparent that except for the nominal membership dues paid in as above set forth, the Association administers funds derived entirely from admission fees paid by patrons of the activities sponsored and directed by the Association. More specifically its principal revenue is derived from conducting basketball tournaments. There is no suggestion that charitable donors have in any ordinary sense made contributions to be administered by the Association.

We cannot agree that the admission fees paid by those attending these athletic contests are in reality charitable "contributions to a school cause." We deem it more accurate to say that the patrons attend for recreation and that the entertainment thus afforded constitutes an adequate *quid pro quo* for the fees charged. There is no suggestion that tickets are purchased by persons who have no intention of attending the sporting events and we therefore

have no occasion to make the assumption which was made by the court in *Smith* v. *Relief Association*, 128 Me. 417. In that case the court said at page 423:

> "Again, plaintiff contends that an annual increment to the funds of defendant, approximating $2,000.00, is realized from sale of tickets to the firemen's ball, at two dollars per ticket. All firemen are supposed to purchase tickets, but none will deny that the main body of such tickets is sold to the general public, and our conclusion is inescapable that the average citizen pays for the ticket which he buys as a contribution to this worthy charity."

In *Jensen* v. *M. E. & E. Infirmary,* 107 Me. 408, in which our court adopted the principle of charitable immunity from tort liability, it was stated at page 410:

> "No principle of law seems to be better established both upon reason and authority than that which declares that a purely charitable institution, *supported by funds furnished by private and public charity,* cannot be made liable in damages for the negligent acts of its servants. Were it not so, it is not difficult to discern that private gift and public aid would not long be contributed to feed the hungry maw of litigation, and charitable institutions of all kinds would ultimately cease or become greatly impaired in their usefulness. * * *

> "The constituent elements which are regarded as characteristic of charitable institutions are defined in *Hospital Association* v. *McKenzie,* 104 Maine, 320, as follows: 'It comes within the letter and the spirit of a charitable corporation whose distinctive feature is that it has no capital and no provision for making dividends or profits, *deriving its funds mainly from public and private charity* and holding them in trust for the object of the institution.' The same doctrine is also emphatically established in Massachusetts. In *McDonald* v. *Mass. Gen. Hospital,* 120 Mass. 432, the

court say: 'The corporation has no capital stock, no provision for making dividends or profits, and whatever it may receive from any source it holds in trust to be devoted to the object of sustaining the hospital and increasing its benefit to the public, by extending or improving its accommodations and diminishing its expenses. *Its funds are derived mainly from public and private charity;* its affairs are conducted for a great public purpose, that of administering to the comfort of the sick, without any expectation, on the part of those immediately interested in the corporation, of receiving any compensation which will enure to their own benefit, and without any right to receive such compensation. This establishes its character as a public charity.' " (Emphasis supplied.)

Several theories have been advanced in support of the doctrine of charitable immunity. Our court saw fit in *Jensen* to rest its grant of immunity upon two grounds, (1) that funds donated for charitable purposes are held in trust to be used exclusively for those purposes, and (2) that to permit the invasion of these funds to satisfy tort claims would destroy the sources of charitable support upon which the enterprise depends. Neither theory would have application where the institution claiming immunity derives none of its support from charitable gifts or donations. *Hamilton* v. *Corvallis General Hospital Ass'n.* (1934), 30 P. (2nd) (Ore.) 9.

The plaintiffs urge us to reconsider and overrule *Jensen.* We are satisfied that if the doctrine of charitable immunity from tort liability were to be abolished in Maine, such a far reaching change in policy should be initiated in the Legislature and receive careful legislative consideration. Charitable institutions have with reason acted upon the assumption that they enjoy the protection from tort liability which has been afforded for many years. In *Nelson* v. *Turnpike Authority*, 157 Me. 174, 186, we said:

"The policy of immunity from liability for tort under the circumstances before us has been so long established and so long acted upon that only the clearest and most convincing reasons should compel a reversal by our court. It cannot be questioned that Legislatures and the people of the State from 1820 have acted or refrained from acting in reliance upon sovereign immunity.

"We may agree that the State or its agency, the Authority, ought to bear the plaintiff's loss under the circumstances set forth. We may agree that sovereign immunity from tort liability has served its usefulness and ought to be destroyed. These are reasons directed, in our opinion, to the determination of the policy of the State, and not to the construction of legislative acts in the process of ascertaining the intent of the Legislature.

"The issue is not complex. Should sovereign immunity in tort, time tested in our State, be discarded or destroyed? This is a policy question which, in our opinion, is more properly directed to the Legislature than to the court."

We see no reason, however, for broadening the class which may be entitled to the immunity. We hold that an organization which receives and administers virtually no charitable gifts or donations is not entitled to immunity from liability for its torts.

*Appeal sustained. Case remanded for further proceedings below in accordance with this opinion.*