2002 ME 25

**Donald COULOMBE**

v.

**The SALVATION ARMY.**

Supreme Judicial Court of Maine.

Argued: Sept. 11, 2001.
Decided: Feb. 15, 2002.

David M. Lipman, Esq. (orally), Sumner H. Lipman, Esq., Karen E. (Lipman) Boston, Esq., Lipman & Katz, P.A., Augusta, for plaintiff.

Richard D. Hewes, Esq., Richard N. Hewes, Esq. (orally), Hewes & Hewes, Alan S. Nye, Esq., Portland, for defendant.

Panel: SAUFLEY, C.J.,and CLIFFORD, RUDMAN, DANA, and CALKINS, JJ.*

DANA, J.

[¶ 1] Donald Coulombe appeals from a summary judgment entered in the Superior Court (Kennebec County, *Studstrup, J.*) in favor of The Salvation Army on its affirmative defense of charitable immunity. Coulombe contends that the court erred in concluding that The Salvation Army is an organization entitled to charitable immunity and did not waive its immunity by maintaining liability insurance. We disagree and affirm the summary judgment.

## I. BACKGROUND

[¶ 2] Michael Coulombe, a resident in a building owned by The Salvation Army, fell down an elevator shaft and suffered fatal injuries. Donald Coulombe, Michael's father and the personal representative of Michael's Estate, filed a complaint in the Superior Court alleging, inter alia, that The Salvation Army negligently caused Michael's death. The Salvation Army raised the affirmative defense of charitable immunity and moved for a summary judgment on that ground.[1]

[¶ 3] Although the parties emphasize different facts in their respective Rule 7(d)[2] statements of material facts, the following facts are not in dispute. The Salvation Army is a non-profit organization funded mainly from public sources and private charity. It derives a substantial portion of its income from its investments. Coulombe conceded at oral argument that even without the inclusion of investment income, The Salvation Army derives over fifty percent of its income from charitable contributions.

[¶ 4] Every Salvation Army branch contributes funds to the national office earmarked for The Salvation Army Trust. The funds of the "Salvation Army Trust" are funds of The Salvation Army. The Salvation Army uses these funds to purchase some insurance and pay for all aspects of risk management. A third-party administrator, Chesterfield Services, han-

---

* Wathen, C.J., sat at oral argument and participated in the initial conference, but resigned before this opinion was adopted.

1. As a second ground for the motion, The Salvation Army raised Michael's signature of a rehabilitation program admittance statement agreeing to indemnify and hold harm-less The Salvation Army. Neither party appeals from the court's judgment on this issue.

2. The rule regarding statements of material facts now appears at Rule 56(h), but when The Salvation Army filed its motion in 1998, Rule 7(d) governed these statements.

dles claims under $25,000 made against The Salvation Army. The Salvation Army's risk management officer has the authority to settle claims between $25,000 and $100,000. The Salvation Army and Chesterfield Services decide whether to pay a claim despite The Salvation Army's charitable immunity.

[¶ 5] The Salvation Army also has an excess liability policy issued by the Zurich Insurance Company, which provides that Zurich

> shall only be liable for [sums which the Insured shall become legally obligated to pay as damages] in excess of either
> a) the limits set forth in the attached Schedule of Underlying Insurance in respect of each Occurrence covered by said underlying insurance [i.e., for our purposes, the general liability coverage provided by The Salvation Army Trust up to a limit of $5,000,000 per occurrence]; or
> b) the amount specified in Item 3(c) of the Declarations [i.e., $10,000] as the result of all Occurrences not covered by said underlying insurance . . . and then only up to a further sum as stated in Item 3 of the Declarations in respect of each Occurrence [i.e., $25,000,000] and subject to the limit as stated in Item 3 of the Declarations in the aggregate for Each Annual Period during the currency of this policy [i.e., $25,000,000]. . . .

For our purposes Zurich will, therefore, pay anything over $5,000,000 for general liability occurrences such as Coulombe's, and anything over $10,000 for occurrences other than the general, automobile or workers' compensation liability claims described in the Schedule of Underlying Insurance.

[¶ 6] Unfortunately for Coulombe, Zurich's general liability coverage only exists for claims in excess of $5,000,000 and the estimate of Coulombe's potential recovery does not exceed $350,000.

[¶ 7] The court granted The Salvation Army's motion for a summary judgment, reasoning that it was entitled to immunity because the sources of its income and assets are predominantly charitable. The court further concluded that the Zurich policy only covered the portion of a judgment that exceeds $5,000,000, and The Salvation Army's "selective . . . self-insurance" does not result in a waiver of charitable immunity.

## II. DISCUSSION

[¶ 8] We review a summary judgment " 'for errors of law, viewing the evidence in the light most favorable to the party against whom the judgment was entered.' " *Stanton v. Univ. of Me. Sys.*, 2001 ME 96, 773 A.2d 1045, 1048. A summary judgment is proper if, on the evidence, there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Id.*

### A. Entitlement to Charitable Immunity

[¶ 9] Coulombe contends that The Salvation Army does not enjoy charitable immunity because it derives a large portion of its income from investments rather than charitable donations.

[¶ 10] An organization is entitled to charitable immunity if it " 'has no capital stock and no provision for making dividends or profits' and . . . derive[s] its funds 'mainly from public and private charity, . . . hold[ing] them in trust for the object of the institution.' " *Child v. Cent. Me. Med. Ctr.*, 575 A.2d 318, 319 (Me.1990) (alterations in original) (quoting *Webber Hosp. Ass'n v. McKenzie*, 104 Me. 320, 329, 71 A. 1032, 1036 (1908)). We have acknowledged two rationales for the re-

quirement that for charitable immunity to apply, funds come mainly from charitable sources: " '(1) that funds donated for charitable purposes are held in trust to be used exclusively for those purposes, and (2) that to permit the invasion of these funds to satisfy tort claims would destroy the sources of charitable support upon which the enterprise depends.' " *Id.* at 320 (quoting *Thompson v. Mercy Hosp.,* 483 A.2d 706, 707–08 (Me.1984)). The Salvation Army bears the burden of establishing that it is entitled to charitable immunity. *See id.*

[¶ 11] Any return on The Salvation Army's investment of charitable funds constitutes income from "public [or] private charity." *Child,* 575 A.2d at 319 (internal quotation marks omitted). That The Salvation Army invested charitable donations does not deprive it of charitable immunity. Moreover, even without including investment income, The Salvation Army receives over fifty percent of its income from charitable sources, which fact distinguishes this case from those we decided in the past. *See id.* at 320 (concluding that a hospital failed to establish charitable immunity where it derived less than one percent of its funds from charitable contributions); *Thompson,* 483 A.2d at 708 (concluding no charitable immunity where the hospital derived only a small fraction of its revenues from charitable donations and its survival did not depend on charitable sources). The Salvation Army is, therefore, entitled to charitable immunity unless it waived that immunity by maintaining insurance.

### B. Waiver of Immunity

[¶ 12] Coulombe contends that The Salvation Army waived its immunity pursuant to 14 M.R.S.A. § 158 (1980), which provides:

A charitable organization shall be considered to have waived its immunity from liability for negligence or any other tort during the period a policy of insurance is effective covering the liability of the charitable organization for negligence or any other tort. Each policy issued to a charitable organization shall contain a provision to the effect that the insurer shall be estopped from asserting, as a defense to any claim covered by said policy, that such organization is immune from liability on the ground that it is a charitable organization. The amount of damages in any such case shall not exceed the limits of coverage specified in the policy, and the courts shall abate any verdict in any such action to the extent that it exceeds such policy limit.

[¶ 13] The Salvation Army bears the burden of establishing that it did not waive its charitable immunity. *See Child,* 575 A.2d at 320 (stating that the defendant bears burden of establishing defense of charitable immunity); *King v. Town of Monmouth,* 1997 ME 151, ¶ 7, 697 A.2d 837, 840 (stating that a town bears burden of establishing it did not waive governmental immunity by maintaining an insurance policy).

### 1. The Salvation Army Trust

[¶ 14] Coulombe contends that The Salvation Army is insured by The Salvation Army Trust, which is operated by a risk manager in consultation with a third party administrator, Chesterfield Services, and into which the Portland chapter contributes a $10,000 "premium."

[¶ 15] The Trust cannot be described as insurance. At most, it resembles self-insurance, which does not result in a waiver of charitable immunity. *See Doucette v. City of Lewiston,* 1997 ME 157, ¶ 9, 697 A.2d 1292, 1295 (citing *May-*

*nard v. Commissioner of Corrections*, 681 A.2d 19 (Me.1996)) (stating that self-insurance does not waive governmental immunity); *Ponder v. Fulton–DeKalb Hosp. Auth.*, 256 Ga. 833, 353 S.E.2d 515, 517 (1987) (holding that self-insurance does not waive charitable immunity because there is no distribution of risk to another and the depletion of the self-insurance fund would invade charitable assets). The Salvation Army's designation that some of its assets are in a trust does not, therefore, result in a waiver of immunity.

2. The Excess Liability Policy

[¶ 16] Coulombe contends that The Salvation Army maintains an excess liability insurance policy insuring it against losses in excess of, or not covered by, the "underlying insurance," which the policy lists as being provided by The Salvation Army Trust. According to Coulombe, the policy provides coverage up to $25,000,000, and The Salvation Army would have to pay only $10,000 if the policy were used.

 [¶ 17] "The interpretation of the terms of an unambiguous insurance contract is a question of law." *Mack v. Acadia Ins. Co.*, 1998 ME 91, ¶ 5, 709 A.2d 1187, 1188 (citing *Globe Indem. Co. v. Jordan*, 634 A.2d 1279, 1282 (Me.1993)).

[¶ 18] The Zurich insurance policy covers general liability claims for personal injuries, but only to the extent the claim exceeds $5,000,000. The policy would cover a claim of less than $5,000,000 only if The Salvation Army's liability is not "covered" by the designated underlying insurance, here The Salvation Army Trust. The underlying self-insurance provided by The Salvation Army Trust covers personal injury claims like Coulombe's.[3] Thus, Zu-

rich's coverage for claims not covered by The Salvation Army Trust is not invoked.

The entry is:

Judgment affirmed.

---

**3.** It should be acknowledged that although The Salvation Army provides for self-insurance through The Salvation Army Trust, in this case it has decided not to pay Coulombe's claim.