2009 ME 67

**William PICHER**

v.

**The ROMAN CATHOLIC BISHOP
OF PORTLAND et al.**

Supreme Judicial Court of Maine.

Argued: Sept. 16, 2008.
Decided: July 7, 2009.

288 ◼ ◼◼◼◼◼◼◼◼◼◼◼◼◼◼

Sumner H. Lipman, Esq. Keith R. Varner, Esq. (orally), Walter F. McKee, Esq., Lipman, Katz & McKee, P.A., Augusta, ME, for William Picher.

Gerald F. Petrucelli, Esq. (orally), Bradford A. Pattershall, Esq., Petruccelli, Martin & Haddow, LLP, Portland, ME, for the Roman Catholic Bishop of Portland.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

Majority: SAUFLEY, C.J., and LEVY, SILVER, MEAD, and GORMAN, JJ.

Dissent: CLIFFORD and ALEXANDER, JJ.

Concurrence: SAUFLEY, C.J., and LEVY, JJ.

SILVER, J.

[¶ 1] William Picher appeals from a judgment of the Superior Court (Kennebec County, *Marden, J.*) granting a summary judgment to the Roman Catholic Bishop of Portland on its affirmative defense of charitable immunity. Picher argues that we should abrogate the doctrine of charitable immunity for acts of negligence associated with the sexual abuse of a minor, and that we should not extend the doctrine to intentional torts. We hold that the doctrine should not be abrogated as to Picher's negligence claims because we see no basis for permitting charitable immunity as a defense to some types of negligence claims but not others. However, we also decline to interpret the relevant statute, 14 M.R.S. § 158 (2008),[1] to extend the reach of charitable immunity to intentional torts. We therefore vacate the judgment as to the intentional tort claim of fraudulent concealment but affirm the judgment as to the remaining claims.

## I. BACKGROUND

[¶ 2] Picher brought this suit against a former priest, Raymond Melville, and the Bishop, based on sexual abuse of Picher by Melville when Picher was a minor in the late 1980s. Picher asserted claims against Melville for negligence, sexual assault and battery, invasion of privacy, intentional infliction of emotional distress, clergy malpractice, and breach of fiduciary duty. Melville defaulted. Picher asserts claims against the Bishop for negligent supervision, breach of fiduciary duty, canonical agency, and fraudulent concealment of facts.

[¶ 3] Picher alleges that the Bishop was on notice that Melville had abused a child before he was ordained as a priest

---

1. Title 14 M.R.S. § 158 (2008) states:

A charitable organization shall be considered to have waived its immunity from liability for negligence or any other tort during the period a policy of insurance is effective covering the liability of the charitable organization for negligence or any other tort. Each policy issued to a charitable organization shall contain a provision to the effect that the insurer shall be estopped from asserting, as a defense to any claim covered by said policy, that such organization is immune from liability on the ground that it is a charitable organization. The amount of damages in any such case shall not exceed the limits of coverage specified in the policy, and the courts shall abate any verdict in any such action to the extent that it exceeds such policy limit.

and before he was assigned to the parish where the abuse of Picher occurred. Picher further alleges that the Bishop failed to report Melville to law enforcement officials and concealed Melville's propensities from parishioners and the public. The Bishop denies these allegations.

[¶ 4] The Bishop is a corporation sole.[2] *See Fortin v. Roman Catholic Bishop of Portland,* 2005 ME 57, ¶ 3 & n. 1, 871 A.2d 1208, 1212. It operates as a non-profit organization and owns, maintains, and operates multiple churches, schools, and other properties. It has no capital stock and no provision for making dividends or profits, and it derives most of its revenues from charitable sources, although parochial school tuition and fees are not considered one of its charitable sources of revenue.

[¶ 5] From July 1, 1986, to July 1, 1988, during the period when the alleged acts occurred, the Bishop was insured by Lloyd's of London pursuant to two consecutive policies, each of which contained an endorsement entitled "Sexual Misconduct Exclusion." This endorsement provides that "[s]exual or physical abuse or molestation of any person by the Assured, any employee of the Assured or any volunteer worker does not constitute personal injury within the terms of this policy and as such any claim arising, directly or indirectly, from the aforementioned is excluded."

[¶ 6] The Bishop moved for summary judgment based on its affirmative defense of charitable immunity. The court granted the Bishop's motion, holding that the Bishop qualifies as a charitable organization and has not waived its charitable immunity pursuant to 14 M.R.S. § 158 because it has no insurance coverage for the claims made by Picher. The court also held that the doctrine of charitable immunity covers both intentional and negligent torts. After a damages hearing, a final judgment was entered against Melville in the amount of $4,227,875. Picher appealed the grant of a summary judgment in favor of the Bishop.

## II. DISCUSSION

### A. Standard of Review

[¶ 7] We review a grant of a summary judgment de novo, considering "the evidence in the light most favorable to the party against whom judgment has been granted to decide whether the parties' statements of material facts and the referenced record material reveal a genuine issue of material fact." *Brawn v. Oral Surgery Assocs.,* 2003 ME 11, ¶ 15, 819 A.2d 1014, 1022 (quotation marks omitted). "We will affirm a grant of summary judgment if the record reflects that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law." *Burdzel v. Sobus,* 2000 ME 84, ¶ 6, 750 A.2d 573, 575. "A genuine issue of

---

**2.** The Bishop was formed as a corporation sole pursuant to P. & S.L. 1887, ch. 151, which states:

Sect. 1. The present Roman Catholic Bishop of the Diocese of Portland, and his successors in office, be and is hereby created a body politic and a corporation sole, under the name and style of the Roman Catholic Bishop of Portland, and by that name the said bishop and his successors in office, shall be known and shall hereafter have succession, with all the powers, rights and privileges prescribed, and subject to all the liabilities imposed by the general statutes of the state.

Sect. 2. The said corporation shall be empowered to receive, take and hold by sale, gift, lease, devise or otherwise, real and personal estate of every description for charitable, educational, burial, religious and church purposes, and to manage and dispose of the same by any form of legal conveyance or transfer according to the discipline and government of the Roman Catholic church, with full power and authority to borrow money and to convey by mortgage deed.

material fact exists when there is sufficient evidence to require a fact-finder to choose between competing versions of the truth at trial." *Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 2, 845 A.2d 1178, 1179. Interpretation of a statute is reviewed de novo. *Ashe v. Enter. Rent–A–Car*, 2003 ME 147, ¶ 7, 838 A.2d 1157, 1159.

[¶ 8] The Bishop asserts a charitable immunity defense as to Picher's claims for negligent supervision, breach of fiduciary duty, and fraudulent concealment. Because we treat the intentional tort claim of fraudulent concealment differently from the negligence claims, we discuss them separately, after we explain the history of the doctrine of charitable immunity.

**B. History and Current Status of Charitable Immunity**

■ [¶ 9] Picher does not explicitly argue that charitable immunity should be abrogated for all acts of negligence, but he does contend that it should be abrogated for acts of negligence in cases, such as this, involving the sexual abuse of a minor. The policy rationale supporting charitable immunity is the protection of charitable funds. *See Jensen v. Me. Eye & Ear Infirmary*, 107 Me. 408, 410–11, 78 A. 898, 899 (1910). Although the rationale itself may be challenged as outdated, as we discuss below, we would need persuasive grounds to hold that charitable funds should be protected against certain types of negligence claims but not others. Without any such grounds, we decline Picher's invitation and do not address the issue further.

[¶ 10] Picher has, however, directly challenged the application of charitable immunity to all intentional torts, an issue we have not previously had occasion to consider. Our decision not to extend the doctrine to intentional torts is based on three aspects of its history: (1) charitable immunity is discredited and has been abandoned

in the majority of jurisdictions; (2) the Legislature did not intend to expand the scope of the common law doctrine of charitable immunity when it enacted section 158; and (3) we have previously held that we would maintain, but not expand, the doctrine, and we would leave it to the Legislature to decide whether to abolish it. We address each of these in turn.

**1. Charitable Immunity Is a Discredited Doctrine**

[¶ 11] This Court introduced charitable immunity as a judicial doctrine almost one hundred years ago and adopted it as an affirmative defense available to non-profit organizations to bar negligence claims. *Jensen*, 107 Me. at 410–11, 78 A. at 899. In *Mendall v. Pleasant Mountain Ski Development, Inc.*, 159 Me. 285, 290, 191 A.2d 633, 636 (1963), we acknowledged, for historical purposes, the two policy justifications for charitable immunity that had been advanced in *Jensen*. These were "(1) that funds donated for charitable purposes are held in trust to be used exclusively for those purposes, and (2) that to permit the invasion of these funds to satisfy tort claims would destroy the sources of charitable support upon which the enterprise depends." *Id.* We upheld charitable immunity in *Mendall*, not because we concluded that these policy reasons were sound, but rather because non-profit organizations had relied upon charitable immunity for so long that abrogation of the doctrine would be far-reaching and should be undertaken by the Legislature. *Id.*

[¶ 12] Since *Mendall*, we have explicitly acknowledged that the rationale for charitable immunity has been severely criticized. *Thompson v. Mercy Hosp.*, 483 A.2d 706, 708 (Me.1984); *Rhoda v. Aroostook Gen. Hosp.*, 226 A.2d 530, 532 (Me. 1967). This criticism has been explained in the Restatement (Second) of Torts:

[T]here has been resort to ideas of "public policy" for the encouragement of charities and mention of the fear that they may be stifled if donors are discouraged from making gifts because their money may go to pay tort claims. The development of liability insurance has made it quite unlikely that donors would fail to recognize it as a legitimate expense of operation. In fact, all of the supposed reasons for the immunity fail when the charity can insure against liability.

Restatement (Second) of Torts § 895E cmt. c (1979).

[¶ 13] A review of the history of charitable immunity and its widespread rejection in other jurisdictions confirms that it remains a doctrine in general disrepute. Charitable immunity had a precarious start in this country after it had been tried and rejected in Great Britain. It was first adopted in the United States in *McDonald v. Massachusetts General Hospital*, 120 Mass. 432 (1876). The court relied on a line of English cases, originating in 1846 from *The Feoffes of Heriot's Hospital v. Ross*, (1846) 8 Eng. Rep. 1508 (H.L.). *See* Restatement (Second) of Torts § 895E cmt. b (1979) (discussing the history of charitable immunity). However, even before *McDonald* was decided, this line of cases had already been repudiated. *See id.* (citing *Mersey Docks v. Gibbs*, (1866) 11 Eng. Rep. 1500 (H.L.)). Eventually, however, most states recognized the doctrine. Restatement § 895E cmt. b.; *see also Flagiello v. Pa. Hosp.*, 417 Pa. 486, 208 A.2d 193, 200 (1965) (discussing the growth of the charitable immunity doctrine in the United States).

[¶ 14] Despite its widespread adoption in the late nineteenth century and the first half of the twentieth century, charitable immunity began to erode quickly by the 1960s. Ira C. Lupu & Robert W. Tuttle, *Sexual Misconduct and Ecclesiastical Immunity*, 2004 BYU L.Rev. 1789, 1797–99 (2004). The Pennsylvania Supreme Court noted that the doctrine of charitable immunity "was built on a foundation of sand." *Flagiello*, 208 A.2d at 200 (citing *President & Dirs. of Georgetown Coll. v. Hughes*, 130 F.2d 810 (D.C.Cir.1942)). By 1984, "virtually all states with decisions on the subject at all ha[d] rejected the complete immunity of charities" with only two or three states having retained "full immunity in the absence of legislation to the contrary." W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 133, at 1070 (W. Page Keeton ed., 5th ed.1984).

[¶ 15] With respect to our neighboring states, charitable immunity has either never been adopted or has long been abolished. New Hampshire and Vermont have never adopted the doctrine. *Welch v. Frisbie Mem'l Hosp.*, 90 N.H. 337, 9 A.2d 761, 763–64 (1939); *Foster v. Roman Catholic Diocese of Vt.*, 116 Vt. 124, 70 A.2d 230, 237 (1950). In 1961, the Rhode Island Supreme Court upheld a statute establishing charitable immunity for hospitals, but it stated that "[t]he question of whether such immunity as a matter of public policy is sound or otherwise may be open to debate," and it left the debate to the legislature. *Fournier v. Miriam Hosp.*, 93 R.I. 299, 175 A.2d 298, 302 (1961). Seven years later, the legislature repealed the statute, *Carroccio v. Roger Williams Hosp.*, 104 R.I. 617, 247 A.2d 903, 904 n. 1 (1968), and thus abolished the last remaining application of charitable immunity in that state, *see Fournier*, 175 A.2d at 300–02 (noting that charitable immunity had been abolished judicially, except where the legislature had provided immunity to charitable hospitals). Connecticut abolished charitable immunity by statute in 1967. *See* Conn. Gen.Stat. Ann. § 52–557d (2005).

[¶ 16] In 1971, after the Massachusetts Supreme Judicial Court threatened to abolish charitable immunity, the state legislature took note and abolished it, but limited the liability of charitable institutions to $20,000 for torts committed in the course of carrying out the charitable purpose. *English v. New England Med. Ctr., Inc.*, 405 Mass. 423, 541 N.E.2d 329, 331 (1989). An intentional tort, such as the one being alleged in this case, would likely fall outside of Massachusetts' statutory immunity, as it would not be considered to have been committed in the course of carrying out the charitable purpose. *See id.* In addition, even when Massachusetts first brought the doctrine of charitable immunity to America (before later abolishing it), the state's highest court implied that an exception existed for charities that did not hire their employees with due care. *McDonald*, 120 Mass. at 436 ("[I]f due care has been used by [the charity] in the selection of [its] inferior agents … it cannot be made responsible.").

[¶ 17] A review of the remaining jurisdictions shows that only a minority of them still recognize charitable immunity, and no state has applied the doctrine to intentional torts. According to the Restatement (Second) of Torts § 895E, Reporter's Notes (1982),[3] twenty-eight states, in addition to those mentioned above, and the District of Columbia have abolished the doctrine of charitable immunity by either supporting or adopting section 895E, which provides: "One engaged in a charitable, educational, religious or benevolent enterprise or activity is not for that reason immune from tort liability."[4] Restatement (Second) of Torts § 895E (1979). Ohio, Louisiana, and Nebraska have also abrogated the common law doctrine of charitable immunity. *Albritton v. Neighborhood Ctrs. Ass'n for Child Dev.*, 12 Ohio St.3d 210, 466 N.E.2d 867, 871 (1984); *Jackson v. Doe*, 296 So.2d 323, 323 (La. 1974) (citing *Garlington v. Kingsley*, 289 So.2d 88, 93 (La.1974)); *Myers v. Drozda*, 180 Neb. 183, 141 N.W.2d 852, 854 (1966).

[¶ 18] South Carolina initially recognized the doctrine of charitable immunity, but, in 1973, the South Carolina Supreme Court explicitly declined to extend it to intentional torts. In *Jeffcoat v. Caine*, the court noted the absence of a public policy rationale for extending charitable immunity to intentional torts, stating,

> Regardless of the public policy support, if there now be such, for a rule exempting a charity from liability for simple negligence, we know of no public policy, and none has been suggested, which would require the exemption of the charity from liability for an *intentional tort;* and we refuse to so extend the charitable immunity doctrine. 261 S.C. 75, 198 S.E.2d 258, 260 (1973) (emphasis added).

South Carolina has since abolished the doctrine of charitable immunity as to all torts, although it limits the amount of damages one can recover from a charitable institution. *Bergstrom v. Palmetto Health Alliance*, 358 S.C. 388, 596 S.E.2d 42, 46 (2004).

---

3. The 1982 publication of the appendix to the Restatement (Second) of Torts included a list of jurisdictions in support of section 895E. Restatement (Second) of Torts § 895E, Reporter's Notes (1982). Because later publications of the appendix to the Restatement do not include this information, we cite to the 1982 publication for this purpose only.

4. Those jurisdictions include: Alaska, Arizona, California, Delaware, District of Columbia, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New York, North Carolina, North Dakota, Oklahoma, Oregon, Pennsylvania, Texas, Utah, Washington, West Virginia, and Wisconsin. Restatement § 895E, Reporter's Notes.

[¶ 19] New Jersey still recognizes charitable immunity, but does not grant immunity for intentional torts. *Hardwicke v. Am. Boychoir Sch.*, 902 A.2d 900, 917 (2006). In New Jersey, charitable immunity is provided by statute, immunizing charities from liability for negligence. *Id.* at 915. In *Hardwicke*, the New Jersey Supreme Court held that the state statute granting charitable immunity did not grant immunity for intentional torts. *Id.* at 917. Therefore, notwithstanding the New Jersey Legislature's codification of charitable immunity, the court declined to interpret the statute to provide immunity for intentional torts. *Id.*

[¶ 20] Of the remaining states that retain some form of charitable immunity, no state has explicitly applied the doctrine to intentional torts. Virginia recognizes charitable immunity, but provides an exception for the negligent hiring of an employee who commits an intentional tort. *J. v. Victory Tabernacle Baptist Church*, 236 Va. 206, 372 S.E.2d 391, 394 (1988). In *Victory Tabernacle Baptist Church*, a church hired an employee recently convicted of aggravated sexual assault of a minor. *Id.* at 392. As was the case here, the employee had duties that put him in contact with children. *Id.* The Virginia Supreme Court held that "the independent tort of negligent hiring operates as an exception to the charitable immunity of religious institutions." *Id.* at 394.

[¶ 21] Alabama has not directly addressed whether charitable institutions should be liable for intentional torts, but the Alabama Supreme Court has otherwise limited the doctrine of charitable immunity, and in dicta implied that charities could be liable for the failure to use ordinary care in the selection of employees. *See Tucker v. Mobile Infirmary Ass'n*, 191 Ala. 572, 68 So. 4, 11 (1915). In addition, an Alabama statute granting immunity to the unpaid directors and officers of non-profit organizations does so only when individuals have not acted with willful or wanton misconduct. Ala.Code § 10–11–3 (Michie, LEXIS through 2009 Reg. Sess.).

[¶ 22] In Maryland and Wyoming, the highest courts have not addressed whether the doctrine applies to intentional torts, but both have created intentional tort exceptions to other doctrines of immunity. *Lusby v. Lusby*, 283 Md. 334, 390 A.2d 77, 89 (1978) (noting that there is no interspousal immunity for intentional torts); *Mills v. Reynolds*, 837 P.2d 48, 55 (Wyo. 1992) (holding that immunity for co-employees in workers' compensation cases does not apply to intentional tortfeasors). Arkansas and Colorado retain some form of charitable immunity, *see Low v. Insurance Co. of North America*, 364 Ark. 427, 220 S.W.3d 670, 674–80 (2005); *Hemenway v. Presbyterian Hospital Ass'n*, 161 Colo. 42, 419 P.2d 312, 313 (1966), but have never expressly applied it to intentional torts. The highest courts in Georgia and Tennessee have not addressed charitable immunity for intentional torts, but charitable immunity in both states only protects the property of charitable trusts. *Morehouse Coll. v. Russell*, 219 Ga. 717, 135 S.E.2d 432, 434 (1964); *Baptist Mem'l Hosp. v. Couillens*, 176 Tenn. 300, 140 S.W.2d 1088, 1091 (1940). Therefore, charitable institutions in those jurisdictions could potentially be liable for any tort, as long as the judgment is applied to non-charitable trust property. In Georgia, however, charitable trust funds can be used to satisfy a judgment against a charity that has failed to use ordinary care in the selection of its employees. *Morehouse Coll.*, 135 S.E.2d at 434.

[¶ 23] Hawaii and South Dakota appear not to have addressed the doctrine of charitable immunity. Finally, New Mexico has not addressed the existence of charitable

immunity. *See, e.g., Los Alamos Med. Ctr. v. Coe*, 58 N.M. 686, 275 P.2d 175, 181 (1954) (reserving the issue of the existence of charitable immunity).

### 2. The Legislature Did Not Intend to Expand the Scope of Charitable Immunity

■ [¶ 24] In 1965, the Legislature enacted 14 M.R.S. § 158, which limits the extent of the charitable immunity defense available to a non-profit organization that is covered by liability insurance. *See* P.L. 1965, ch. 383. The Bishop argues that 14 M.R.S. § 158 should be interpreted to apply charitable immunity to intentional torts. This interpretation would require a determination that the Legislature intended to modify the common law because, at the time section 158 was enacted in 1965, the doctrine of charitable immunity had been applied to negligence actions, *see Mendall*, 159 Me. at 286–90, 191 A.2d at 634–36; *Jensen*, 107 Me. at 410–11, 78 A. at 899, but we had not had occasion to consider whether to apply the doctrine to intentional torts. When the Legislature modifies the common law by statute, it must do so with clear and unambiguous language:

> [W]e have long embraced the well-established rule of statutory construction that the common law is not to be changed by doubtful implication, be overturned except by clear and unambiguous language, and that a statute in derogation of it will not effect a change thereof beyond that clearly indicated either by express terms or by necessary implication.

*Batchelder v. Realty Res. Hospitality, LLC*, 2007 ME 17, ¶ 23, 914 A.2d 1116, 1124 (quotation marks omitted).

[¶ 25] Section 158 does not clearly and unambiguously express legislative intent to expand the scope of the common law doctrine of charitable immunity. Section 158 states: "A charitable organization shall be considered to have waived its immunity from liability for negligence or any other tort during the period a policy of insurance is effective. . . ." This language is ambiguous; the words "or any other tort," plausibly suggest that section 158 was meant to expand the applicability of charitable immunity beyond its historical bounds, to cover any tort, including intentional torts. The other interpretation is that the statute has only one purpose, which is to deny charitable immunity, to the extent it would otherwise be available under the charitable immunity doctrine, when the non-profit organization is covered by insurance.

■ [¶ 26] When a statute is ambiguous, we review its legislative history to discern legislative intent. *Liberty Ins. Underwriters, Inc. v. Estate of Faulkner*, 2008 ME 149, ¶ 15, 957 A.2d 94, 99. The purpose of section 158 was to limit charitable immunity. *See* 2 Legis. Rec. 2679, 2848 (1965). There is nothing in the legislative history to indicate that section 158 was intended to do anything other than that, nor is there any indication of an intent to confer immunity for intentional torts. The 1965 floor debates for section 158 reflect several facts. As originally introduced, the bill would have completely abolished charitable immunity. L.D. 587 (102d Legis.1965); *see* 2 Legis. Rec. 2848 (1965). There are repeated references in the floor debates to this Court's decisions recognizing charitable immunity for negligence. 2 Legis. Rec. 2675, 2676, 2849, 2850 (1965). The final bill was a compromise, abolishing immunity only when the non-profit organization has insurance. L.D. 1580 (102d Legis.1965); 2 Legis. Rec. 2673, 2851 (1965). There is no evidence that the Legislature intended the bill to expand the scope of charitable immunity, nor is there any discussion in the

floor debates of immunity for intentional torts. The floor debates contain several references to the discredited status of charitable immunity and to the fact that most other states had abandoned it. 2 Legis. Rec. 2675, 2676, 2849, 2851 (1965). Section 158 is therefore properly interpreted solely as a limitation on charitable immunity, not an expansion of it.

### 3. The Court Has Maintained Charitable Immunity but Declined to Either Expand or Abrogate It

[¶ 27] Charitable immunity remains a judicial doctrine, subject to our interpretation, notwithstanding that the Legislature created an exception to the doctrine with the enactment of section 158. *Child v. Cent. Me. Med. Ctr.*, 575 A.2d 318, 319 (Me.1990); *Thompson*, 483 A.2d at 707 & n. 3. In *Thompson*, we noted that "[t]he doctrine of charitable immunity is a creation of our common law. Except for one significant restriction imposed by statute, its applicability in Maine is controlled entirely by the precedents of this Court." 483 A.2d at 707 (footnotes omitted). It is therefore appropriate for this Court to continue to determine the scope of charitable immunity.

[¶ 28] We have previously held that we would maintain, but neither expand nor eliminate, the doctrine of charitable immunity. We noted in *Rhoda* that the adoption of section 158 provides a basis "for our continued adherence to the charitable immunity doctrine." 226 A.2d at 532. Although we have maintained the doctrine to date, we have declined either to expand it beyond its traditional bounds or to contract it. *Child*, 575 A.2d at 319–20; *Thompson*, 483 A.2d at 708; *Rhoda*, 226 A.2d at 532–33.

### C. Charitable Immunity and Picher's Fraudulent Concealment Claim

[¶ 29] For three reasons, we do not recognize the defense of charitable immunity in claims involving intentional torts. First, applying charitable immunity to intentional torts would set Maine so far outside the mainstream that it would put this State in a class by itself. We do not believe it advisable to expand so profoundly a doctrine that has generally been acknowledged as bankrupt. Second, nothing in the legislative history of section 158 indicates any legislative intent to so interpret the doctrine of charitable immunity. Third, there are no convincing policy reasons to apply charitable immunity to intentional torts. We therefore hold that charitable immunity is not available as a defense to intentional torts.

[¶ 30] We now consider whether Picher has stated a cause of action against the Bishop, as a corporation sole, for fraudulent concealment. The elements of a claim of fraudulent concealment are: (1) a failure to disclose; (2) a material fact; (3) where a legal or equitable duty to disclose exists; (4) with the intention of inducing another to act or to refrain from acting in reliance on the non-disclosure; and (5) which is in fact relied upon to the aggrieved party's detriment. *See Letellier v. Small*, 400 A.2d 371, 376 (Me.1979) (stating the elements of fraud); *Morrow v. Moore*, 98 Me. 373, 57 A. 81 (1903) (holding that the withholding of information does not amount to fraudulent concealment absent a duty to disclose), *overruled on other grounds by Rulon–Miller v. Carhart*, 544 A.2d 340, 342 (Me.1988); *Marcotte v. Allen*, 91 Me. 74, 77, 39 A. 346, 347 (1897) (holding that silence may be fraudulent). Picher alleges that the Bishop had actual or constructive knowledge that Melville sexually assaulted minors, breached its duty to disclose that knowledge, and affirmatively concealed the knowledge with the intent to mislead Picher and his family.

Picher and his family relied on the Bishop to Picher's detriment. Picher has stated a claim for fraudulent concealment.

██ [¶ 31] The Bishop argues that it is entitled to a summary judgment on vicarious liability because the alleged actions in furtherance of fraudulent concealment were, as a matter of law, outside of the scope of employment. Vicarious liability on the fraudulent concealment claim is distinct from vicarious liability for Melville's sexual misconduct. Vicarious liability for fraudulent concealment is a claim of liability based on the actions of an agent or agents of the Bishop, other than Melville, for fraudulently concealing from Picher the propensity of Melville to commit sexual misconduct. The Bishop, however, sought summary judgment based solely on its charitable immunity defense. The Bishop did not make any argument about vicarious liability before the Superior Court and consequently did not preserve this issue for appeal. *See Foster v. Oral Surgery Assocs., P.A.*, 2008 ME 21, ¶ 22, 940 A.2d 1102, 1107. We therefore decline to decide this issue.

[¶ 32] However, because vicarious liability will be at issue on the fraudulent concealment claim on remand, we provide updated guidance on the applicable law. We have previously turned to the Restatement (Second) of Agency §§ 219, 228 (1958) for guidance on issues pertaining to employer vicarious liability. *Mahar v. StoneWood Transp.*, 2003 ME 63, ¶¶ 13–14, 19–21, 823 A.2d 540, 544, 545–46; *McLain v. Training & Dev. Corp.*, 572 A.2d 494, 497–98 (Me.1990). The Restatement (Third) of Agency has since been published and states:

(1) An employer is subject to vicarious liability for a tort committed by its employee acting within the scope of employment.

(2) An employee acts within the scope of employment when performing work assigned by the employer or engaging in a course of conduct subject to the employer's control. An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer.

(3) For purposes of this section,

(a) an employee is an agent whose principal controls or has the right to control the manner and means of the agent's performance of work, and

(b) the fact that work is performed gratuitously does not relieve a principal of liability.

Restatement (Third) of Agency § 7.07 (2006).[5] The Restatement (Third) of Agency § 7.08 (2006) may also be relevant, as this section is the counterpart to the Restatement (Second) of Agency § 219(2)(d) (1958) and also addresses vicarious liability in the employment context. We express no opinion as to the applicability of either section 7.07 or section 7.08 of the Restatement (Third) of Agency to the facts of this case, except to say that on remand, the court may look to these sections to provide the appropriate framework for analyzing the vicarious liability issues raised in this case.

D. Charitable Immunity and Picher's Negligence Claims

██ [¶ 33] Having addressed Picher's intentional tort claim, we turn to his negli-

5. Comment b to section 7.07 explains the changes in the formulation of the scope-of-employment doctrine between Restatement (Third) of Agency § 7.07(2) (2006) and its predecessors, Restatement (Second) of Agen- cy §§ 228, 229 (1958), including that section 7.07(2) is stated in more general terms and takes into account changes in workplace practices. Restatement (Third) of Agency § 7.07 cmt. b (2006).

gence claims. Because we reject Picher's argument that charitable immunity should be abrogated as a defense as to some types of negligence claims but not others, we must address two additional issues relevant to the Bishop's assertion of this defense: (1) whether the Bishop, as a corporation sole and a non-profit institution, is entitled to assert charitable immunity, and (2) whether the Bishop waived immunity through the purchase of insurance.

[¶ 34] Principles of tort law and charitable immunity apply to the Bishop as they do to any corporation. The Bishop, as a corporation sole, is "[a] series of successive persons holding an office; a continuous legal personality that is attributed to successive holders of certain monarchical or ecclesiastical positions, such as kings, bishops, rectors, vicars, and the like." Black's Law Dictionary 366 (8th ed.2004). "This continuous personality is viewed, by legal fiction, as having the qualities of a corporation." *Id.* In accordance with the private and special law pursuant to which the Bishop was established as a corporation sole, it is to be treated as a corporation under Maine law, "with all the powers, rights and privileges prescribed, and subject to all the liabilities imposed by the general statutes of the state." P. & S.L. 1887, ch. 151, § 1. Thus, the defense of charitable immunity applies no differently to a corporation sole than to other types of organizations.

[¶ 35] A party seeking charitable immunity bears the burden of establishing both that it is entitled to charitable immunity and that it has not waived immunity. *Coulombe v. Salvation Army,* 2002 ME 25, ¶¶ 10, 13, 790 A.2d 593, 595–96. The Bishop meets the requirements for non-profit status. We have held that an organization is entitled to charitable immunity if it "has no capital stock and no provision for making dividends or profits and ... derive[s]

its funds mainly from public and private charity, ... hold[ing] them in trust for the object of the institution." *Id.* ¶ 10, 790 A.2d at 595 (quotation marks omitted). The parties do not dispute that the Bishop meets these requirements.

[¶ 36] The parties dispute whether the Bishop has waived charitable immunity, pursuant to 14 M.R.S. § 158, through the purchase of insurance. We have held that a charitable organization with insurance coverage is deemed to have waived its tort immunity to the extent of its insurance coverage. *Thompson,* 483 A.2d at 707 n. 3. We have previously noted that the Legislature modified charitable immunity "to the extent of permitting recovery of damages to an amount not exceeding the limits of insurance coverage which the charity might be carrying at the time of the negligent or tortious act." *Rhoda,* 226 A.2d at 531.

[¶ 37] Picher makes both a procedural and a substantive argument about the Bishop's insurance coverage. We interpret Picher's procedural argument to be essentially that the Bishop, as the moving party on summary judgment, has the burden to demonstrate that there is no genuine issue of material fact regarding insurance coverage, and because the Bishop did not produce evidence that it submitted a claim to Lloyd's of London and that Lloyd's of London denied the claim, the Bishop has not met this burden. The Bishop responded with a motion to supplement the record; we denied the motion. Although we acknowledge that the issue of insurance coverage may, in some circumstances, present a genuine issue of material fact precluding summary judgment, this is not such a case. We decline to impose the requirement that the insured in all instances submit a claim to, or litigate coverage with, the insurer prior to moving for summary judgment on the de-

fense of charitable immunity. The language of the policies held by the Bishop is not in dispute, and we may interpret it as a matter of law. "The interpretation of an insurance contract exclusion and its applicability is a matter of law reviewed de novo." *Pease v. State Farm Mut. Auto. Ins. Co.*, 2007 ME 134, ¶ 7, 931 A.2d 1072, 1075.

[¶ 38] Picher's substantive argument regarding waiver is that the insurance policy language should be interpreted to provide coverage, and the Bishop therefore should be deemed to have waived charitable immunity. Picher argues that the sexual misconduct exclusion should not apply to his claims because exclusions in insurance policies are generally not favored. *See Gross v. Green Mountain Ins. Co.*, 506 A.2d 1139, 1141 (Me.1986). Picher also argues that the sexual misconduct exclusion does not apply because the claims against the Bishop for negligent supervision, breach of fiduciary duty, and fraudulent concealment are distinct from his claims against Melville for sexual abuse.

[¶ 39] Picher's claims against the Bishop are unambiguously excluded from the insurance policy.

> Exclusions in an insurance contract are interpreted consistently with their obvious contractual purpose. Although ambiguities in standard insurance policies drafted by the insurer are interpreted against the insurer, exclusionary language is not ambiguous if an ordinary person in the shoes of the plaintiff would understand that the policy does not cover [his] claims.

*Sarah G. v. Me. Bonding & Cas. Co.*, 2005 ME 13, ¶ 10, 866 A.2d 835, 838 (quotation marks and citation omitted). We have not previously had occasion to consider whether an exclusion similar to that in this case could bar a claim of negligent supervision. In *Sarah G.*, we did not reach the issue

because the plaintiffs conceded that if the conduct at issue constituted abuse pursuant to the insurance policy, the sexual misconduct exclusion at issue in that case would bar a negligence claim. *Id.* ¶ 9, 866 A.2d at 838. In other jurisdictions, courts have interpreted sexual misconduct exclusions and other types of misconduct exclusions to preclude coverage for negligent hiring and supervision claims. *See, e.g., Gulf Underwriters Ins. Co. v. KSI Servs., Inc.*, 233 Fed.Appx. 239, 241–42 (4th Cir. 2007) (holding that negligent supervision claim was barred due to exclusion for dishonest or criminal acts); *All Am. Ins. Co. v. Burns*, 971 F.2d 438 (10th Cir.1992) (holding that claims for negligent failure to investigate and negligent failure to discharge were barred due to sexual misconduct exclusion); *Am. Commerce Ins. Co. v. Porto*, 811 A.2d 1185 (R.I.2002) (holding that negligent supervision claim was barred due to sexual misconduct exclusion). As a matter of law, Picher's claims against the Bishop are excluded from coverage, and therefore the Bishop has not waived charitable immunity.

The entry is:

Judgment affirmed as to all claims against the Bishop except fraudulent concealment. Judgment vacated as to the claim of fraudulent concealment. Remanded for further action consistent with this opinion.

ALEXANDER, J., with whom CLIFFORD, J., joins, dissenting.

[¶ 40] The Court's opinion provides an extensively documented policy discussion of the history of charitable immunity. That discussion begins with the observation that we recognized charitable immunity "as an affirmative defense available to non-profit organizations to bar *negligence* claims." (Emphasis added.) In fact, we

have emphasized the importance of charitable immunity to protect charitable resources from "invasion of these funds to satisfy *tort* claims." *Coulombe v. Salvation Army,* 2002 ME 25, ¶ 10, 790 A.2d 593, 596 (emphasis added) (quotation marks omitted); *Mendall v. Pleasant Mountain Ski Dev., Inc.,* 159 Me. 285, 290, 191 A.2d 633, 636 (1963) (emphasis added).

[¶ 41] The Court employs this policy discussion to support the Court's view that Maine's common law of charitable immunity is an anachronism and that the Maine Legislature's enactment of charitable immunity into law must be amended by judicial opinion to limit its application to torts involving only negligence. The result of the Court's action today is that any charitable institution may be hauled into court and forced to expend its resources to defend a suit through trial any time a plaintiff pleads some intentional act or failure to act as part of its cause of action.

[¶ 42] The Court's opinion, holding that charitable immunity protection may be avoided simply by pleading some intentional act or failure to act, effectively ends charitable immunity in Maine. I respectfully dissent from the Court's opinion. The articulate policy arguments expressed by the Court should be addressed to the Legislature to support legislative action to amend the law that, without ambiguity, protects charities from suit "for negligence or any other tort." 14 M.R.S. § 158 (2008).

[¶ 43] By invading the province of the Legislature and effectively striking "or any other tort" from our statute books, the Court fails to respect the separation of powers provision, article III, section 2, of the Maine Constitution and makes a policy judgment exposing all Maine charities to a wide range of lawsuits from which, until today, they have been protected by more than a century of legislative and judicial action.

[¶ 44] As the Court's opinion amply demonstrates, charitable immunity has been an important fixture of our law affecting the planning, funding, operation, and governance of charitable institutions in Maine for more than a century. In *Jensen v. Maine Eye & Ear Infirmary,* 107 Me. 408, 410–11, 78 A. 898, 899 (1910), cited by the Court, we observed that:

No principle of law seems to be better established both upon reason and authority than that which declares that a purely charitable institution, supported by funds furnished by private and public charity, cannot be made liable in damages for the negligent acts of its servants. Were it not so, it is not difficult to discern that private gift and public aid would not long be contributed to feed the hungry maw of litigation, and charitable institutions of all kinds would ultimately cease or become greatly impaired in their usefulness.

[¶ 45] *Jensen* reminds us that by 1910, charitable immunity was well established in the common law of Maine. Anticipating today's debates about the costs of litigation, *Jensen* also emphasizes that the purpose of charitable immunity was to protect the resources of Maine charities from both the recovery of damages and the costs of litigation, costs that, even if they prevail in litigation, can prove ruinous to small institutions. *See id.* The *Jensen* court did not contemplate that charitable immunity protection could be easily avoided by pleading an extra word like "intent" or "intentional" in stating a cause of action.

[¶ 46] Today's opinion has great significance beyond this case. The existence of charitable immunity and the protection it creates is important to the planning and continued existence of many community-based organizations including local grang-

es, arts organizations, fraternal groups, youth programs, churches, and some schools and health care providers. As we held in *Jensen,* such protection is important because funds donated for charitable purposes are held in trust to be used exclusively for those purposes and, without charitable immunity, resources could be sacrificed "to feed the hungry maw of litigation, and charitable institutions of all kinds would ultimately cease or become greatly impaired in their usefulness." *Id.* at 411, 78 A. at 899.

[¶ 47] Just seven years ago, we confirmed our holding in *Jensen,* observing that, "to permit the invasion of these funds to satisfy tort claims would destroy the sources of charitable support upon which the enterprise depends." *Coulombe,* 2002 ME 25, ¶ 10, 790 A.2d at 596 (quotation marks omitted); *accord Mendall,* 159 Me. at 290, 191 A.2d at 636.

[¶ 48] Two years after *Mendall,* the Legislature enacted 14 M.R.S. § 158, placing into Maine statutory law a broad-based charitable immunity protection, subject to an exception only for claims covered by insurance procured by the charity. P.L. 1965, ch. 383; P.L.1965, ch. 513, §§ 27–28 (effective Feb. 8, 1966). That law, unchanged until today, recognizes charitable immunity from liability "for negligence or any other tort," that is subject to waiver only by purchase of insurance. 14 M.R.S. § 158.

[¶ 49] Two years after the Legislature's action, in *Rhoda v. Aroostook General Hospital,* 226 A.2d 530, 531–33 (Me. 1967), we recognized that while the Legislature could have abolished common law charitable immunity, it had instead enacted broad-based charitable immunity into statutory law, subject only to the purchase of insurance exception. In *Rhoda,* we emphasized the importance of deference to legislative, policy-based decision-making on this subject because "[w]hat the public policy of this State in such an important area of life and action should be may necessitate the conduct of a general investigation which this Court in litigated cases is ill-equipped to undertake." *Id.* at 532.

[¶ 50] Legislative enactment of broad-based charitable immunity, now more than forty years in the past, allows many poorly funded organizations to provide important community services using facilities such as grange halls, art museums, Little League ball fields, or houses of worship. These organizations serve their communities without facing the Hobson's choice of shutting down because they cannot afford the cost of insurance or remaining open to face the risk of lawsuits which, even if successfully defended, may cost more than the organization can afford.

[¶ 51] Today the Court sweeps away the protection enacted by the Legislature. In so doing, the Court invades the province of the Legislature in an area where, in *Rhoda* and *Mendall,* we acknowledged that the Legislature had primary authority to act to adopt, reject, expand, or modify the doctrine of charitable immunity. *Rhoda,* 226 A.2d at 532–33; *Mendall,* 159 Me. at 290, 191 A.2d at 636. In *Mendall,* addressing a proposal to abolish charitable immunity, we stated words that ring true today: "[S]uch as a far reaching change in policy should be initiated in the Legislature and receive careful legislative consideration." 159 Me. at 290, 191 A.2d at 636.

[¶ 52] To justify its invasion of the Legislature's province to amend 14 M.R.S. § 158, the Court appears to conduct a referendum of actions by other state supreme courts to conclude that since those courts appear to be cutting back on charitable immunity, we should follow suit. The Court's referendum, however, lacks citations to other state statutes similar to

section 158.[6] It is that statute, and our obligation to respect it until amended by the Legislature, that necessarily separates Maine from other states in our approach to charitable immunity.

[¶ 53] The Court also cites two of our past opinions in which, the Court suggests, we reserved to ourselves the capacity to change or abolish the doctrine of charitable immunity despite legislative enactment of section 158. Each of those opinions, *Child v. Central Maine Medical Center,* 575 A.2d 318 (Me.1990) and *Thompson v. Mercy Hospital,* 483 A.2d 706 (Me.1984), involved attempts by hospitals to expand the protections in section 158 to cover all activities of entities that receive only a portion of their incomes from charitable sources. In each instance, we rejected the attempts to have us amend section 158 to expand its coverage from primarily charitable organizations to any organization that performs charitable-like functions and derives a small portion of its income from charitable sources. *Child,* 575 A.2d at 320; *Thompson,* 483 A.2d at 708.

[¶ 54] Those precedents, refusing to expand the applicability of the charitable immunity enacted by the Legislature from "a charitable organization" to any organization that performs some charitable functions, do not support the proposition that we may, at will, amend or repeal section 158.

[¶ 55] The Court concludes that section 158, recognizing immunity from liability for "negligence or any other tort," does not include intentional torts. This view violates our basic rule of statutory construction that a statute, if it is not ambiguous, must be given its common, ordinary meaning, without resort to rules of construction. *Ashe v. Enter. Rent-A-Car,* 2003 ME 147, ¶ 7, 838 A.2d 1157, 1159. The protection from liability for "negligence *or any other tort*" must mean protection from suit for torts in addition to negligence, including intentional torts. Limiting application of section 158 to negligence torts, as the Court does, renders the "or any other tort" phrase superfluous. Such a limiting interpretation violates another basic rule of statutory construction that no language in a statute may be viewed as superfluous if a construction supplying meaning to a phrase is possible. *Struck v. Hackett,* 668 A.2d 411, 417 (Me.1995); *Labbe v. Nissen Corp.,* 404 A.2d 564, 567 (Me.1979).

[¶ 56] A claim of fraud, fraudulent misrepresentation, or fraudulent concealment is a tort like any other, although one that must be proved by clear and convincing evidence. *See Rand v. Bath Iron Works Corp.,* 2003 ME 122, ¶ 9, 832 A.2d 771, 773. It is a tort easily pled, but difficult to prove. Nothing in legislation or our prior precedents creates a charitable immunity exception to blow open the courthouse

---

6. The Court's opinion also may overstate the extent to which charitable immunity has been limited in other states. It correctly quotes Prosser's observation that "virtually all states" have "rejected the complete immunity of charities," and that only two or three states have retained "full immunity in the absence of legislation to the contrary." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 133 at 1070 (W. Page Keeton ed., 5th ed.1984). But the Court's authority for these observations, Prosser, qualifies those broad observations, noting that some states, like Maine, "permit a recovery against a charity's non-trust fund assets—usually insurance—but not otherwise," and that in some states "immunity has been retained or reinstituted by statute, but only for certain particular cases," *id.,* including protection for religious institutions, *id.* at 1070 n. 15. The Court also counts Massachusetts among the states to have abolished charitable immunity. But with today's costs of litigation, Massachusetts' "abolition" of immunity that imposes a $20,000 limit on damages seems more like a qualified acceptance of charitable immunity than an abolition of it.

door for those who employ the tactic of adding a fraud or intentional inaction claim to a negligence claim to force charities to defend against tort actions and confront all of the attendant costs and risks to the trust resources that we have stated must be protected from such actions.

[¶ 57] Forty-six years ago, in *Mendall,* we stated that changes in the doctrine of charitable immunity have far-reaching policy implications that should be initiated in the Legislature and receive careful legislative consideration. 159 Me. at 290, 191 A.2d at 636. That is as true today as it was then. The Court should leave amendment or abolition of the doctrine of charitable immunity and section 158 to the Maine Legislature. I would affirm the judgment of the Superior Court.

SAUFLEY, C.J., with whom LEVY, J., joins, concurring.

[¶ 58] This case presents a classic jurisprudential problem: how to interpret legislative intent when a particular phrase within a statutory sentence plainly leads to one conclusion, but the context of the sentence within which the phrase falls leads, after consideration of the legislative history, to a flatly contrary conclusion. The question is this: Did the Maine Legislature, when it used the phrase "any other tort" in enacting 14 M.R.S. § 158 (2008), intend to expand the existing common law doctrine of charitable immunity to such an extent that it immunizes a charity from liability when the charity, whether it is a local grange or an international religious organization, engages in the intentional and surreptitious placement of a known pedophile in a position of power over vulnerable children.

[¶ 59] In the end, I join the Court and concur in the Court's conclusion that the Legislature did not intend that result. Because, however, I agree with the dissent

that the phrase "any other tort" would in a different context be understood to include intentional torts, I write separately to address the reasons I do not join the dissent.

[¶ 60] We have emphasized that Maine statutes "must be construed as a whole in order to effectuate the legislative intent." *Fernald v. Me. State Parole Bd.,* 447 A.2d 1236, 1238 (Me.1982). Considered in its entirety, section 158 does not purport to define or expand the charitable immunity doctrine, and the expansive phrase "any other tort," contained within the first sentence of otherwise *limiting* language, creates an ambiguity requiring resort to legislative history. That history does not contain any indication of an intent to expand charitable immunity. If the Legislature had, in fact, engaged in weighing the risks posed by *intentional torts,* including the potential sexual assault of children, against the possibility of destructive litigation costs incurred by Maine's long tradition of charitable organizations, one would have expected much more robust debate and much clearer language.

[¶ 61] Thus, despite the dissent's understandable reliance on the plain language of the phrase "any other tort," I conclude that the context of the phrase cannot support the expansive intent that the words would otherwise convey. This is a close and difficult question for any court. If the Court has read that legislative intent incorrectly, the Legislature can remedy the Court's interpretation through clarifying language that expands charitable immunity to encompass intentional torts.